# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Purple Motorola Phone inventoried as<br>281M-SD-3731971-1B3 | )<br>)<br>)<br>)<br>)<br>)    Case No.   **23mj4289-KSC** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein,

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1029(a)(2), (a)(4), (b)(1) | access device fraud (use of unauthorized access devices; production or possession of device-making equipment; attempt) |

The application is based on these facts:

See Attached Affidavit of Task Force Officer Michelle Storms, incorporated herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Michelle Storms*
_____
*Applicant's signature*

Task Force Officer Michelle Storms
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: ___ 11/27/2023 ___

_____
*Judge's signature*

City and state: San Diego, California

Hon. Karen S. Crawford, US Magistrate Judge
_____
*Printed name and title*

AFFIDAVIT IN SUPPORT OF
COMPLAINT & APPLICATION FOR SEARCH WARRANT

I, Michelle Storms, being duly sworn, state as follows:

1.      This affidavit is in support of a Complaint to arrest Ioan BUDA for violating 18 U.S.C. §§ 1029(a)(2) (use of unauthorized access devices), (a)(3) (possession of 15 or more unauthorized access devices with intent to defraud), and (b)(1) (attempt) and an application by the United States of America for a warrant to search the following electronic device, as described in Attachment A:

a.      Purple Motorola Phone inventoried as 281M-SD-3731971-1B3 (**"Target Device 1"**) for items from February 1, 2023 through and including July 13, 2023, which constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, Title 18, United States Code, Sections 1029(a)(2) (use of unauthorized access devices), 1029(a)(4) (production or possession of device-making equipment), and (b)(1) (attempt to commit access device fraud), as described in Attachment B. This search warrant affidavit and application are sought pursuant to Rule 41 of the Federal Rules of Criminal Procedure.

EXPERIENCE & TRAINING

2.      I am a Deputy Sheriff for the San Diego County Sheriff's Department. I have been a Deputy Sheriff since January 2011. I am currently assigned to the San Diego Federal Bureau of Investigation (FBI) field office, Organized Crime Squad (OC-1) and have been so since February 2022. I was cross sworn with the FBI on November 28, 2022.  I was previously assigned to the San Diego Human Trafficking Task Force and previously cross sworn with the United States Marshall's Service. I have received training and gained experience in interviewing and interrogation techniques, surveillance techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer evidence seizure and processing, and various other criminal laws and procedures. I have personally participated in the execution of search warrants involving the search and seizure of cellular telephones and other electronic devices.

3.      The facts and conclusions set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this and related investigations into California Electronic Benefit Transfer (EBT) fraud; my review of documents and records related to this and related investigations; communications with others who have personal knowledge of the events, details, and circumstances described herein; and information gained through my training, experience, and communications with colleagues. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth every fact that I or others have learned during this investigation. Dates, times, and amounts are approximate.

<u>STATEMENT OF PROBABLE CAUSE</u>

*Overview*

4.      The FBI and its Task Force partners are working with state and federal agencies to investigate the theft and misuse of funds electronically distributed to individuals receiving public assistance.

5.      As described below, on March 10, 2023, San Diego law enforcement found BUDA in possession of 38 access device cards encoded with stolen California Electronic Benefit Transfer account information. BUDA was later found to have withdrawn $13,360 from San Diego County ATMs using 17 of these unauthorized access devices and to have attempted to make unsuccessful withdrawals using an additional three cards.  BUDA was arrested at the time and later released.  On July 13, 2023, Border Patrol agents near Yuma, Arizona encountered BUDA and arrested him for being a deported alien found in the United States.  BUDA subsequently pled guilty in the District of Arizona to violating 8 U.S.C. § 1326 and was recently sentenced.

*Background on Electronic Benefit Transfer Cards*

6.      In 2022, California's Department of Social Services (CalDSS) advised the FBI's  Organized Crime Squad (FBI-OC1) that it had detected a rise in fraud associated

AFFIDAVIT                                                       -2-

with the electronic debit cards issued to individuals and families who qualify for California public benefits like CalFresh and CalWORKS.

7.      The U.S. Department of Agriculture also noticed a rise in fraud associated with the Supplemental Nutrition Assistance Program (SNAP) that it administers through its Food and Nutrition Service (FNS).  SNAP is a federally funded assistance program designed to help low-income individuals and families purchase food.  In California, SNAP public assistance benefits are distributed through CalFresh and loaded to an account that a qualified recipient access by means of an access card, similar to a debit or credit card, called the California Advantage Electronic Benefit Transfer (EBT) Card. The EBT card system was developed to enable government agencies in California and many other states to deliver public assistance benefits to recipients using electronic transfers. The EBT system is a computer-based system through which authorization for qualifying food purchases and cash withdrawals is received from either a point-of-sale (POS) terminal or an ATM.

8.      CalWORKS is a public assistance program that provides cash aid to eligible families with one or more children in the home.  Families that apply and qualify for ongoing CalWORKS assistance receive money each month to help pay for housing, food, and other necessary expenses.  CalWORKS, along with CalFresh, is distributed by CalDSS through the California Advantage EBT card.

9.      After a recipient applies for, and is approved to receive, California public assistance benefits, the benefits are automatically distributed to the recipient's EBT card on a designated day of the month (typically, in California, the first five days of the month).  To access their benefits to purchase eligible food items, recipient swipe their card through a point-of-sale terminal, or insert it into an ATM, that records the card number, date, time, and amount of the transaction.  The recipient then enters his/her unique Personal Identification Number (PIN) into a keypad to complete the transaction.

AFFIDAVIT                                                  -3-

10.     The FBI and other federal law enforcement agencies have gathered evidence indicating that members of what appear to be one or more criminal enterprises are stealing California EBT account information by installing skimmers on point-of-sale terminals, often by targeting point-of-sale terminals at large volume retailers, like Walmart, in communities with higher concentrations of public benefit recipients.  The skimmed data is then often re-encoded onto the magnetic strips of cards that members of the conspiracy use to make unauthorized withdrawals and purchases. These re-encoded cards are sometimes referred to as "cloned" cards.  Cloned cards can be a blank white plastic card, or another debit, credit, or gift card.  Cloned cards may have names or numbers embossed on the physical face of the card.  A common feature of cloned cards is that the account number encoded on the card's magnetic strip will not match the number embossed on the card's face.  To facilitate the use of the stolen EBT benefits, members of the scheme will commonly put stickers bearing the account's PIN on the physical cards, or access devices, that are swiped at a point-of-sale terminal along with the account balance.

11.     Data provided by CalDSS indicates that, between approximately August 2022 and January 2023, in the Southern District of California and elsewhere, more than approximately $38.9 million has been stolen using compromised EBT account information.  Most of the stolen funds were obtained through unauthorized ATM withdrawals.  CalDSS reports that approximately $2.3 million has been stolen through unauthorized ATM withdrawals in San Diego County and San Diego residents who receive EBT benefits have had approximately $2.9 million of their benefits fraudulently withdrawn at ATMs outside the county.

*March 2023 San Diego Operation*

12.     Beginning on March 1, 2023, FBI San Diego in partnership with San Diego Police Department, San Diego Sheriff's Department, and Bureau of Public Assistance Investigations initiated surveillance operations at ATMs in San Diego County. On

AFFIDAVIT                                          -4-

March 3rd, 2023, at approximately 0006 hours, surveillance units observed a black BMW SUV (CA 8NRV364) drive into the parking lot of US Bank located at 1606 Grand Avenue, San Diego, in the Pacific Beach neighborhood. The BMW then proceeded to the drive-thru ATM and started using the ATM. Surveillance units then observed the male driver (later identified as Ioan BUDA 6/17/71) making several transactions at the drive-thru ATM.

13.    BUDA then drove to a nearby alley, exited his vehicle, and used a walk-up ATM, where he again appeared to conduct multiple transactions. BUDA wore what appeared to be a tan floppy "San Diego" hat, a blue "San Diego" sweatshirt, a pink bandana covering his face, and a ponytail (see photo below). The ponytail was later determined to be a wig.



14.    At the ATM, BUDA appeared to pull a card from his wallet, insert it into the ATM, pull the cash out, and put the money in his front left pant pocket and the used card in his right front pocket. He would systematically repeat the process until he was done with the cards. BUDA stayed at the ATM for approximately 15-20 minutes before driving away to a Bank of America, located at 912 Garnet Avenue, San Diego. At the Bank of America, surveillance units saw BUDA make several transactions before leaving the property.

AFFIDAVIT

15.    US Bank is headquartered in Minnesota and Bank of America is headquartered in North Carolina.  For these reasons, BUDA's unauthorized transactions at these banks' California ATMs are believed to be in and affecting interstate commerce.

16.    Surveillance units ran a record check with California DMV for the license plate (CA 8NRV364) on the black BMW SUV that BUDA was driving. Investigators ultimately learned that this license plate (CA 8NRV364) was stolen from a *different* black BMW, based, in part on the following:

a.    DMV records for the license plate on the BMW that BUDA was driving (CA 8NRV364) showed the plate was registered to a BMW that belonged to "B.C." at a nearby address (1810 Grand Avenue) in Pacific Beach.

b.    As the plate's registered owner resided close by, surveillance units drove by the registered owner's residence and saw a similar black BMW backed into the driveway.  FBI SA Loveland noticed that the vehicle parked in the driveway had the same *front* license plate number as the BMW driven by BUDA, but the parked vehicle's rear license plate was missing.  As described below, investigators later interviewed B.C., the registered owner of the plates and parked BMW, who confirmed the rear plate had been stolen.

17.    Surveillance units then followed the BMW driven by BUDA to a Wells Fargo bank located at 1302 Garnet Ave, San Diego.  At the Wells Fargo bank branch, surveillance units saw BUDA conduct several transactions at the drive-thru ATM.  At that time, a San Diego Police marked patrol vehicle arrived and parked behind the BMW driven by BUDA.  When the marked vehicle arrived, BUDA drove away.  Uniformed police officers then stopped BUDA's vehicle at 4500 Fanuel Street, San Diego.

18.    Officer Sanchez contacted the sole occupant of the BMW, Ioan BUDA. BUDA identified himself with a United Kingdom Driver's License. Officer Sanchez informed BUDA the reason for the traffic stop was the license plate for the BMW he

was driving did not come back to that BMW. BUDA said that he had rented the BMW he was driving.

19.     Around this time, San Diego Police Department Detective Rudy Castro, who is also a Task Force Officer with OC-1, went to 1810 Grand Avenue, San Diego and contacted B.C., the registered owner of the car whose rear license plate was found on BUDA's rental vehicle. B.C. agreed to speak with TFO Castor and reported that he had not given anyone permission to take his license plate off his vehicle nor to affix it to another vehicle.

20.     A records check was done on the BMW that Buda was driving. The VIN in the windshield of BUDA's vehicle had been written over with pink/purple sharpie marker.   Officers were still able to decipher the VIN (5UX33DT03N9M43798). Dispatchers advised that the correct plate for that VIN should have been CA 9BIT826, which was registered to a car rental company "SIXT Rental". Due to BUDA's BMW having a stolen license plate attached to it, BUDA was arrested.  At the time of his arrest, BUDA was determined to be bald and to have been wearing a wig while making the unauthorized ATM withdrawals.



21.     Following BUDA's arrest, Officer Sanchez conducted an inventory search of the rented BMW prior to it being towed.  During the search, Officer Sanchez noticed a large denomination of US Paper Currency ($1,920.00) along with gift cards (26) that were hidden underneath the front driver side soft floor covering. There was also US paper currency ($11,440.00) inside the "San Diego" hat that BUDA was seen wearing

AFFIDAVIT                                                    -7-

earlier along with an additional 12 gift cards. Another $31.00 was in the center console. Officer Sanchez noticed that there were also two operable phones along with a pink bandana face covering on top of the front passenger side seat.

22.     Upon the conclusion of the inventory search, officers inventoried 38 gift cards that appeared to have PIN numbers written in a black marker on the backs. The handwritten four or six-digit number, which appears to be a PIN, is a common theme that individuals engaged in skimming and access device fraud use to keep track of the cards' PIN. Buda was then transported to San Diego Police headquarters for processing. He declined to speak with law enforcement and was released pending further investigation.

23.     On March 8, 2023, a California state search warrant was granted, allowing a forensic examination of the seized cell phones. Attempts to access and download the phones were unsuccessful.

24.     On March 10, 2023, a California state search warrant was granted, allowing a forensic examination of the ATM cards seized from BUDA at the time of his arrest. Analysis of the cards indicated that, out of the 38 ATM cards seized from BUDA, all were encoded with valid California EBT account information issued to someone else. Records obtained from CalDSS show that Buda attempted transactions on 20 of the 38 cards found in his possession. Out of the 20 attempted transactions, BUDA successfully withdrew $13,360 using 17 of those access cards. Investigators with CalDSS confirmed the victims to whom those EBT accounts were issued did not give permission for BUDA or anyone else to withdraw their money using duplicate access cards.

25.     In my training and experience, the individuals who build and manufacture skimming devices used to compromise EBT account information are not usually the same individuals who install them. Similarly, once the skimmed data is retrieved from a compromised point-of-sale terminal or ATM, it must be re-encoded onto new cards

1   and paired up with the corresponding PIN so that funds can then be withdrawn from the

2   compromised account.  Coordinating the dissemination of these cards and PINs requires

3   organization. In part for these reasons, I believe that BUDA is likely working with

4   others as part of a scheme to steal and misuse EBT account information.

5                    BUDA's July 2023 Arrest for Illegal Re-Entry

6        26.    On July 13, 2023, BUDA was arrested at a Border Patrol checkpoint 1155,

7   located near Welton Station's Area of Operations, in between Yuma and Welton, Yuma

8   County, Arizona. BUDA admitted at the time that he was a Romania citizen and

9   national and did not have the necessary documents to allow him to enter or remain in

10  the United States. BUDA also admitted that he had previously illegally re-entered the

11  United States.  BUDA was charged with violating 8 U.S.C. § 1326(a) and (b)(1) (Case

12  No. 23cr1179-GMS).  On November 13, 2023, BUDA was sentenced to seven months'

13  custody and three years' supervised release.

14       27.    At the time of his arrest by Border Patrol, BUDA possessed two cell

15  phones and a tablet, i.e., a gold Apple iPhone 14, a purple Motorola cell phone (**Target**

16  **Device 1**), and a TCL tablet.  The devices were seized incident to BUDA's arrest. On

17  August 25, 2023, Arizona Border Patrol Investigators obtained a warrant from District

18  of Arizona United States Magistrate Judge James F. Metcalf.  The warrant (23-

19  2371MB) authorized the search and seizure of the three target devices. After obtaining

20  and executing the federal search warrant, Border Patrol provided the target items to FBI

21  San Diego. The items are now in FBI custody in San Diego.

22       28.    On September 26, 2023, the target devices were submitted for forensic

23  analysis pursuant to the Arizona warrant. The only device that was able to be unlocked

24  for analysis was the Motorola cell phone (**Target Device 1**), inventoried as 281M-SD-

25  3731971- 1B3.

26

27

28

AFFIDAVIT                                    -9-

Evidence to be Searched for

29.    Upon examining the Attachment B of the Arizona search warrant, San Diego investigators saw that it authorized the seizure of "Any records and information found within the digital contents of the SUBJECT CELLULAR TELEPHONES AND TABLE that relate to violations of U.S.C. Section 1326 and 18 U.S.C. Sections 1029(a)(2) and 1343. . . ."  The particularized descriptions of the evidence to be seized, however, did not expressly identify the types of evidence associated with access device fraud and wire fraud that are typically sought in warrants executed in similar cases the Southern District of California.  For this reason, San Diego investigators did not search **Target Device 1** for evidence of or relating to access device or wire fraud.

30.    Instead of relying on the Arizona warrant, this application seeks a new warrant authorizing the search of **Target Device 1** for evidence of and relating to skimming and EBT access device fraud-related activity.

31.    In my training and experience, the individuals who build and manufacture skimming devices used to compromise EBT account information are not usually the same individuals who install them. Similarly, once the skimmed data is retrieved from a compromised point-of-sale terminal or ATM, it must be re-encoded onto new cards and paired up with the corresponding PIN so that funds can then be withdrawn from the compromised account.  Coordinating the dissemination of these cards and PINs requires organization. In part for these reasons, I believe that BUDA is likely working with others as part of a scheme to steal and misuse EBT account information.

32.    Based on forensic searches of phones seized in similar EBT fraud cases, individuals involved in EBT fraud and related skimming activities commonly use their phones as instrumentalities of the fraudulent activity.  In some situations, individuals will use phones to download skimmed data from Bluetooth-enable skimmers installed on point-of-sale terminals and ATMs.  More commonly, individuals will use their phones to communicate with coconspirators, navigate routes for skimming and fraud-

AFFIDAVIT                                          -10-

related travel, reserve short-term housing and vehicle rentals, take photos and videos of and relating to skimming and EBT fraud, and conduct balance inquiries for compromised accounts.   In part for these reasons, I submit there is probable cause to believe that evidence of relating to access device fraud will be found on **Target Device 1**.

33.     In the surveillance of BUDA on March 3, 2023, he did not appear tentative or confused.  Rather, he appeared to have a system for separating the cash and used cards.  In part for this reason, I do not believe that this was the first time he used compromised EBT account information to make unauthorized EBT account withdrawals.  Instead, I believe it is more likely that BUDA was involved in the scheme prior to encounter.  This affidavit therefore seeks authorization to search **Target Device 1** from February 1, 2023 through and including the date of his arrest by Border Patrol on July 13, 2023.

<u>Procedures for Electronically-Stored Information</u>

**Cell Phones**

34.     It is not possible to determine, merely by knowing the cellular phone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device.  Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing.  An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device.  For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.  Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the

device or in memory cards inserted into the device.  Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software.  Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

35.     Following the issuance of this warrant, the FBI will review the data from target device 1. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

36.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months.   The personnel conducting the identification and extraction of data will complete the analysis within ninety (**90**) days of the date the warrant is signed, absent further application to this court.

<u>PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE</u>

37.     The United States is aware that, on August 25, 2023, a search warrant was obtained from the District of Arizona for the target devices belonging to BUDA. The devices were transferred to FBI San Diego's custody and were not forensically analyzed by Law Enforcement personnel in Arizona.

<u>CONCLUSION</u>

38.     For the reasons described above, I submit there is probable cause to arrest BUDA for violating 18 U.S.C. §§ 1029(a)(2) (use of unauthorized access devices), (a)(3) (possession of 15 or more unauthorized access devices with intent to defraud), and (b)(1) (attempt).  I also respectfully submit there is probably cause to believe that

AFFIDAVIT

-12-

1  evidence of and relating to BUDA's involvement in skimming and access device fraud,
2  as described in Attachment B, are more likely than not to be found on **Target Device**
3  **1**, as described in Attachment A.

4                                              *Michelle Storms*
5                                     Task Force Officer Michelle Storms
6                                     San Diego County Sheriff's Department

7  Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1
8  by telephone on November  27 , 2023.

9
10                                     HON. KAREN S. CRAWFORD
11                                     U.S. MAGISTRATE JUDGE

AFFIDAVIT                                    -13-

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The following property is to be searched:

      a.    Purple Motorola Phone inventoried as 281M-SD-3731971-1B3;

(the **"Target Device 1"**).

The Target Device is in the custody and control of the Federal Bureau of Investigation, at 10385 Vista Sorrento Pkwy, San Diego, CA 92121.

## ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search the Target Device described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Target Device for evidence described below. The seizure and search of the Target Device shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the Target Device will be electronic records, communications, and data such as emails, text messages, mobile messaging application content, social media content, images, records from third-party and websites applications (e.g., Mapquest, Google Maps), photographs, audio files, videos, browsing history, and location data, for the period of February 1, 2023, up to and including July 13, 2023, for the following:

a.  Communications, records, images, videos, electronic files, and attachments tending to discuss or pertain to access devices (e.g., EBT cards, debit cards, the electronic track data embedded on such cards) or account information associated with such devices (e.g., PINs, names), including but not limited to the unauthorized use, interception, collection, transfer, or possession of such devices or related account information;

b.  Communications, records, images, videos, electronic files, and attachments tending to discuss or pertain to skimming devices, or the location or manner in which such devices are installed, deployed, distributed, collected, or manufactured;

c.  Communications, records, images, videos, electronic files, and attachments tending to discuss or reflect an intent to i) steal or misuse access devices, or account information associated with such devices, or ii) install, deploy, distribute, collect, or manufacture unauthorized skimming devices, that would tend to discuss or establish motive,

opportunity, intent, preparation, plan, knowledge, absence of mistake, or lack of accident, with regard to the crimes under investigation;

d.     Communications, records, images, videos, electronic files, and attachments tending to discuss, reflect, or pertain to the proceeds, fruits, or instrumentalities of or from the use of unauthorized access devices like EBT account information, credit card information, or debit card information;

e.     Communications, records, images, videos, electronic files, and attachments tending to discuss, reflect, or pertain to the proceeds, fruits, or instrumentalities of or from the production, control or custody, or possession of access device-making equipment;

f.     Communications, records, images, videos, electronic files, and attachments tending to identify the user(s) of, or persons with control over or access to, the Target Device, including the telephone number associated with any of the Target Devices and, without any date restriction, all contact entries;

g.     Communications, records, images, videos, electronic files, and attachments tending to identify the user(s) of the Target Device's state of mind, knowledge, motive, and voluntariness regarding the crime under investigation, such as any communications, records, or attachments demonstrating knowledge that EBT or debit or credit card account information, PINs, victim names, skimmers, or access devices were being used without authorization or with an intent to deceive;

h.     Communications, records, images, videos, electronic files, and attachments tending to identify or establish the use of fake or stolen personal identification information, such as the names or PINs found on California Advantage cards;

i.     Communications, records, images, videos, electronic files, and attachments tending to identify any co-conspirators, co-schemers,

criminal associates, or others involved in a scheme to steal or misuse access device card information; and

j.    Communications, records, images, videos, electronic files, and attachments that provide context to any communications, records, images, videos, electronic files, and attachments described above, such as electronic messages sent or received in temporal proximity to any relevant electronic message and any content tending to identify the user(s) of the device to be searched;

**which are evidence of violations of 18 U.S.C. §§ 1029(a)(2) (use of unauthorized access devices), 1029(a)(4) (production, control or custody, or possession of access device-making equipment), and 1029(b)(1) (attempt).**